**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5701-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

D.C.W.,[1]

     Defendant-Appellant.

_____

     Submitted April 9, 2019 – Decided May 28, 2019

     Before Judges Yannotti, Rothstadt and Gilson.

     On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 12-08-1141.

     Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

---

[1] We use initials to identify defendant and others to protect the identities of the victims. See R. 1:38-3(c)(9), (12).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (Joie Piderit, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of first-degree aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a), and other offenses. He was sentenced to an aggregate term of incarceration of thirty years, and required to serve eighty-five percent of that term before becoming eligible for parole, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals from the judgment of conviction (JOC) dated April 17, 2017. For the reasons that follow, we affirm in part, reverse in part, and remand for reconsideration of the restitution ordered by the trial court.

I.

A Middlesex County grand jury charged defendant with: first-degree aggravated sexual assault against K.H., N.J.S.A. 2C:14-2(a) (count one); third-degree aggravated criminal sexual contact against K.H., N.J.S.A. 2C:14-3(a) (count two); second-degree endangering the welfare of K.H., B.W., and L.H.P., N.J.S.A. 2C:24-4(a) (counts three, seven, and nine); third-degree witness tampering of K.H., N.J.S.A. 2C:28-5(a)(2) (count four); third-degree witness tampering of K.A.H., N.J.S.A. 2C:28-5(a)(2) (count five); second-degree sexual

2

assault against B.W., N.J.S.A. 2C:14-2(b) (count six); and second-degree sexual assault of L.H.P., N.J.S.A. 2C:14-2(b) (count eight). Prior to trial, the court denied defendant's motion to sever the charges, and granted the State's motions to admit statements that B.W. made to her mother and an investigating detective. Defendant was thereafter tried before a jury.

A. Evidence Regarding B.W.

B.W. was born in 2005. Defendant is B.W.'s biological father and C.G.Y. is her biological mother. Defendant and C.G.Y. broke up in 2006, but later resumed their relationship before terminating it again in 2007. The Family Part permitted defendant to have visitation with B.W. Initially, B.W. was allowed to visit with defendant every Saturday, but later he had visitation with B.W. every other weekend.

In October 2009, B.W. spent the weekend with defendant at the home he shared with his parents. She was then four years old. When she returned home, B.W. told C.G.Y. "that someone had been bad touching [her]." C.G.Y. asked who had done this, and B.W. said it was her dad. C.G.Y. asked B.W. what she meant when she said "bad touching," and B.W. "took her hand and . . . cupped it and touched down in her vaginal area, and then reached back to her backside."

B.W. also told C.G.Y. she saw defendant naked, and that she saw defendant's buttocks, legs, and feet.

C.G.Y. did not report the matter to the police, but called defendant and talked to him about it. The next day, B.W. went to school and around lunchtime, the principal called C.G.Y. and told her she needed to come to the school. When C.G.Y. arrived at the school, she met with detectives, the principal, and a teacher who said B.W. told her about the alleged abuse. C.G.Y. was told she needed to take B.W. to the Middlesex County Prosecutor's Office (MCPO) to provide a statement.

C.G.Y. drove B.W. to the MCPO and during the ride, asked B.W. about her disclosure the previous day. C.G.Y. testified that B.W.'s story did not change, but B.W. also said defendant "licked [her] butt." B.W. told C.G.Y. defendant removed her pants and licked her "butt" while she was drawing.

C.G.Y. and B.W. spoke separately to Investigator Candido Arroyo of the MCPO, who also testified at the trial. Arroyo testified that he spoke to B.W., but was unable to gather enough evidence for the MCPO to continue the investigation.

Thereafter, C.G.Y. and B.W. spoke with employees of the Division of Youth and Family Services (the Division).[2] The Division's representatives told C.G.Y. not to discuss the allegations with B.W., and C.G.Y. testified that she complied with this directive. Thereafter, B.W. stopped visiting defendant for a few weeks, but visitation resumed after defendant's mother agreed to supervise the visits.

In April 2012, C.G.Y. picked up B.W. after a visit with defendant. B.W., who was then six years old, appeared very tired and was not acting like herself. C.G.Y. questioned B.W. and asked B.W. if there was anything she wanted to tell her. B.W. repeatedly said there was nothing wrong; however, she eventually said defendant "had been touching her inappropriately."

C.G.Y. asked B.W. what happened. B.W. took her hand and put it down near her vagina. C.G.Y. testified that B.W. said she and defendant were lying down and watching a movie when defendant put his hands down her pants and touched her "between her legs." B.W. also told C.G.Y. that this did not occur while defendant was bathing her or helping her in the bathroom.

---

[2] The Division is now known as the Division of Child Protection and Permanency. See N.J.S.A. 9:3A-10(b).

C.G.Y. took B.W. to the New Brunswick Police Department (NBPD), where they met with a detective. They were instructed to go to the MCPO the following day to provide statements. The following day, C.G.Y. and B.W. met with Investigator Andreea Capraru, who also testified at the trial. Capraru described the training she received in conducting forensic interviews of children. Thereafter, the State played a recording of Capraru's interview with B.W.

In the interview, Capraru asked B.W. if there are "any touches that you don't like?" B.W. replied, "Yes. There's only two that – one, because my dad does this. He touches me – he rubs me on the private part that – that I talk [sic] about with Detective Jones. And he watches some videos about that. Actually they don't touch it. They actually lick it. Ew."

B.W. told Capraru that this had happened twelve times and that it happens every time she sees defendant. B.W. stated that she was with defendant in the living room on the sofa and defendant asked B.W. to lay on him. B.W. said defendant put his hand inside her jeans and underwear. According to B.W., defendant touched and rubbed her vagina. B.W. also said defendant was playing video games and watching a video on his computer of "a person licking a girl."

B.W. also testified at the trial. She was then ten years old. She testified that she was in the living room with defendant, and she was sitting on

defendant's lap when he touched her vagina. She remembered telling C.G.Y. about the incident, and said she told her mother exactly what she testified to.

B. <u>Evidence Regarding K.H.</u>

Defendant is the biological father of K.H., who was born in 1996. Her mother is K.A.H. When K.H. was fourteen years old, K.A.H. reached out to defendant and requested that he spend time with K.H. Thereafter, K.H. began to spend time with defendant on a regular basis, and she visited his home every other weekend.

In the summer of 2011, defendant and K.H. went to a camp. They slept in the same tent. K.H. testified that she was lying on her side, with her back towards defendant when she felt him "scooch[]" towards her. K.H. said she moved away from defendant, and then felt what she thought was a thumb "poking by [her] vagina."

K.H. stated that the thumb "was trying to go inside." She moved away and confronted defendant. According to K.H., defendant said that it helps him sleep, and that he feels comfortable when he is close to and inside someone. K.H. told defendant she wanted to go home, and they left the camp the next morning.

When K.H. returned, she told K.A.H. that the trip was okay, that she did not want to do it again, and that defendant was weird. K.H. also told K.A.H. that she did not want to visit defendant every weekend and did not want to stay overnight; however, sometime later, K.H. returned and spent the night at defendant's home.

K.H. testified that she was in the basement of defendant's home and defendant came downstairs. She stated that defendant got on his knees and placed his face near her vagina. She said she "felt direct air from like his breath or whatever in my vagina." K.H. felt defendant's hand on her clitoris, and defendant rubbed it in a circular motion. She confronted defendant and he told her he has a sleeping condition and walks in his sleep.

K.H. later transferred to a school where defendant worked. She testified that one day, and while she was walking to school with defendant, he told her that someone was going to talk to her and he instructed her to "tell them that you don't know anything." Defendant said it had something to do with B.W. K.H. then called her mother, told her about what defendant said to her. K.H. apparently stated that "she wanted to tell the truth, because she kn[e]w that [defendant] had touched [B.W.] because he had touched her too."

Thereafter, K.A.H. called defendant, and he told her not to speak to anyone from the Division or anyone else who called her about this. Defendant told K.A.H. "that he was going to handle it; it was going to be over, and it just didn't happen and this is not, you know, going to last long[.]"

Sometime later, K.H. spoke to the police regarding the alleged abuse. Detective Jeffrey Maroccia of the MCPO testified at trial that he interviewed K.H. and her mother. Maroccia also recorded a telephone conversation between defendant and K.H., which was played for the jury. In that conversation, defendant told K.H. to tell the investigators "that you were mad about the situation . . . [a]nd that this did not . . . go down and you want . . . them to leave you alone. And then your mother could tell them, all right, that that's what you want."

C. Evidence Regarding L.H.P.

L.H.P. is the stepdaughter of defendant's brother, L.P. L.H.P. testified at trial. She was seventeen years old at that time. She stated that in June 2012, after her parents learned about the other allegations against defendant, they asked her if defendant had ever done anything like that to her.

L.H.P. testified that in 2008, when she was nine years old, she was at defendant's residence with her brother. Defendant was watching them while

their parents went out. According to L.H.P., defendant was upstairs watching television while at his computer. Defendant told L.H.P. to come to his computer, and he placed her on his lap, and "opened [her] legs with his legs[.]"

L.H.P. said she put her legs back together, but defendant opened them again. Defendant was watching what he called "cartoons," but what was actually animated pornography. Defendant unbuckled L.H.P.'s jeans and touched her vagina for a minute and a half under her underwear. After he stopped, defendant told L.H.P. to keep what happened a secret.

Defendant elected not to testify. He called one witness, his father R.W. R.W. testified that he was home for parts of the day in April 2012 when B.W. alleged defendant touched her. He said he did not observe defendant engage in any inappropriate behavior. He also testified that B.W. gave defendant a kiss when defendant woke up the morning after the alleged abuse.

The jury found defendant guilty on counts one through eight. The jury also found defendant not guilty of second-degree endangering the welfare of L.H.P., as charged in count nine, but guilty of the lesser-included offense of third-degree endangering the welfare of a child by a non-caretaker.

The trial court sentenced defendant on April 6, 2017. As we stated previously, the judge sentenced defendant to an aggregate prison term of thirty

years, and required that he serve eighty-five percent of that sentence before becoming eligible for parole, pursuant to NERA. The judge also ordered defendant to comply with Megan's Law, and to pay $25,000 in restitution. In addition, the judge imposed appropriate fines and penalties, and ordered defendant not to have contact with the victims. The judge entered a JOC dated April 17, 2017. This appeal followed.

On appeal, defendant raises the following arguments:

> POINT I
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S SEVERANCE MOTION BECAUSE THERE WAS NO VALID REASON FOR JOINING THE COUNTS PERTAINING TO THE SEPARATE COMPLAINANTS, AND JOINDER SERVED ONLY TO IMPERMISSIBLY SUGGEST THAT DEFENDANT HAD A PROPENSITY TO COMMIT SEXUAL ASSAULT AND TO IMPROPERLY BOLSTER THE TESTIMONY OF EACH VICTIM. THE TRIAL COURT ALSO ERRED BY FAILING TO ISSUE AN INSTRUCTION LIMITING THE JURY FROM USING THE JOINED OFFENSES FOR THESE IMPERSMISSIBLE PURPOSES. (Partially Raised Below).
>
> POINT II
> THE IMPROPER ADMISSION OF [B.W]'S UNRELIABLE OUT-OF-COURT STATEMENTS REGARDING SEXUAL ABUSE, PURSUANT TO [N.J.R.E.] 803(c)(27), DENIED DENFENDANT THE RIGHT TO DUE PROCESS AND A FAIR TRIAL.

11

POINT III

THE TRIAL COURT ERRED IN FAILING TO
PROPERLY TAILOR THE MODEL CHARGE ON
STATEMENTS OF A DEFENDANT TO THE FACTS
OF THIS CASE.  (Not Raised Below).


POINT IV

THE TRIAL COURT IMPOSED A SENTENCE
BASED ON AN INAPPLICABLE AGGRAVATING
FACTOR AND IMPROPERLY IMPOSED
CONSECUTIVE TERMS, RESULTING IN AN
EXCESSIVE SENTENCE THAT MUST BE
REDUCED.

POINT V

THE $25,000 RESTITUTION ORDER SHOULD BE
VACATED OR, ALTERNATIVELY, THIS MATTER
MUST BE REMANDED FOR A HEARING
REGARDING DEFENDANT'S ABILITY TO PAY.
(Not Raised Below).

II.

We turn first to defendant's contention that the trial court erred by denying

his severance motion.  Defendant contends the indictment contained three sets

of offenses involving three different victims.  He maintains the charges as to the

three victims should have been severed and tried separately.  We disagree.

Our court rules provide that "[t]wo or more offenses may be charged in

the same indictment or accusation in a separate count for each offense if the

offenses charged are of the same or a similar character[.]"  R. 3:7-6.  The court

may, however, "order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief" where "it appears that a defendant . . . is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment[.]" R. 3:15-2(b).

"Central to the inquiry is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (alteration in original) (quoting State v. Pitts, 116 N.J. 580, 601-02 (1989)). Where the evidence is admissible at all of the trials, joinder is permissible "because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

Rule 404(b) bars the admission of other-crimes evidence "to prove the disposition of a person in order to show that such person acted in conformity therein." N.J.R.E. 404(b). Other-crimes evidence is, however, admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." Ibid.

The party seeking to introduce other-crimes evidence must satisfy the four-part test enunciated in State v. Cofield, 127 N.J. 328, 338 (1992). Under that test,

> 1. [t]he evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. [i]t must be similar in kind and reasonably close in time to the offense charged;
>
> 3. [t]he evidence of the other crime must be clear and convincing; and
>
> 4. [t]he probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

"The decision whether to sever an indictment rests in the sound discretion of the trial court." Chenique-Puey, 145 N.J. at 341 (citing State v. Briley, 53 N.J. 498, 503 (1969)). We must "defer to the trial court's decision, absent an abuse of discretion." Ibid. (citing State v. Erazo, 126 N.J. 112, 131 (1991); State v. Brown, 118 N.J. 595 (1990)).

Here, the motion judge made detailed findings on the Cofield factors. The judge found that the other-crimes evidence is relevant to the issue of intent and the absence of mistake. The judge noted that defendant told the investigators his touching of B.W. was unintentional, and he may have touched her when he

moved her. Defendant also told the investigators and K.A.H. that he touched K.H. because he has a sleeping condition and walks in his sleep.

The judge also found that the offenses involving the three victims were related, since they all involved allegations of sexual assault against young girls, and "that the approximate four-year span of these allegations does not render them unreasonably attenuated." The judge further found that the offenses were established by clear and convincing evidence.

In addition, the judge recognized that defendant would be prejudiced by having all of the counts in the indictment tried together, but concluded that the evidence of the other crimes was "highly probative of the material issues of intent and absence of mistake[.]" The judge therefore concluded that the severance motion must be denied.

On appeal, defendant argues that the judge misapplied the Cofield factors. He contends that because he denied any wrongdoing, the judge erred by finding that the other-crimes evidence was admissible on the issue of intent. However, as the judge noted, defendant told investigators his touching of B.W. was unintentional, and he may have touched her when he moved her. In addition, he told investigators and K.A.H. that he touched K.H. due to a sleeping disorder.

15

Moreover, at oral argument, defendant's counsel refused to abandon any defense based on mistake. Although the defense at trial was not one based on intent or absence of mistake, this issue "was projected by the defense as arguable before trial" and "was one that the defense refused to concede." State v. P.S., 202 N.J. 232, 256 (2010) (citing State v. Stevens, 115 N.J. 289, 301-02 (1989)). The record supports the judge's conclusion that the other-crimes were relevant to the issue of intent and lack of mistake. See State v. Cusick, 219 N.J. Super. 452, 464-66 (App. Div. 1987) (holding evidence of a prior conviction for sexual assault was admissible to rebut the defendant's claim of mistake in sexual assault case).

Defendant further argues that the trial judge erred in his instructions to the jury on the other-crimes evidence. Defendant argues the trial judge's charge was insufficient because it failed to instruct the jury that it could not use the other-crimes evidence as proof of defendant's propensity to commit the crimes charged.

"When other-crimes evidence is admitted pursuant to Rule 404(b), the jury must be instructed as to the permissible use of such evidence and its limited relevance." State v. Winder, 200 N.J. 231, 255 (2009) (citing Stevens, 115 N.J. at 304). The trial court's instruction "should be formulated carefully to explain

16

precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." Ibid. (quoting Stevens, 115 N.J. at 304).

"In determining whether a charge was erroneous, the charge must be read as a whole." State v. Jordan, 147 N.J. 409, 422 (1997) (citing State v. Wilbely, 63 N.J. 420, 422 (1973)). "No party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." Ibid. (citing Largey v. Rothman, 110 N.J. 204, 206 (1988); State v. Thompson, 59 N.J. 396, 411 (1971)).

In this case, defendant did not object to the jury charge. We therefore review the instructions for plain error and may reverse only if the error was one "clearly capable of producing an unjust result." State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

Here, the trial judge gave the following instruction about the other-crimes evidence:

> There are nine offenses charged in the indictment. They are separate offenses by separate counts in the indictment. In your determination of whether the State has proven the defendant guilty of the crimes charged in the indictment beyond a reasonable doubt, the defendant is entitled to have each count

A-5701-16T1

considered separately by the evidence, which is relevant and material [to] that particular charge, based on the law as I will give it to you.

The trial judge also instructed the jury that the charges related to B.W., L.H.P. and K.H. were "separate and distinct." The judge instructed the jury that the charges as to each victim must "be considered separately[,] . . . and they rise and fall independently on their own merits."

We note that in addition to failing to object to the instruction, defense counsel also told the judge that the proposed instruction was "fine," when the judge asked if the instruction was "strong enough." In any event, we conclude the judge erred by failing to instruct the jury it could not consider the other-crimes evidence as proof of defendant's propensity to commit the crimes charged. See Winder, 200 N.J. at 255. We are convinced, however, that the error was not "clearly capable of producing an unjust result" because the judge specifically instructed the jury that the charges as to the three victims were "separate and distinct" and the jury had to consider the charges independently "on their own merits." In light of that instruction, the jury was unlikely to consider the other-crimes evidence as proof that defendant had a propensity to commit the offenses charged.

In support of his arguments on appeal, defendant relies upon State v. Krivacska, 341 N.J. Super. 1 (App. Div. 2001). In that case, the trial court joined an indictment charging the defendant with sexually abusing M.B. and an accusation charging the defendant with sexually abusing T.A. Id. at 37. We affirmed the trial court's joinder because the other crimes were relevant to the issue of defendant's opportunity to commit the crimes. Id. at 41.

We also considered the trial court's jury charge regarding the other-crimes evidence. Id. at 41-44. The trial judge had instructed the jury that "[t]he defendant is entitled to have his guilt or innocence separately considered on each count by the evidence which is relevant and material to that particular charge based on the law as I will give it to you." Id. at 42.

We held that this instruction was improper, because the trial judge "did not specifically tell the jury that it could not consider the other-crime evidence to determine that the defendant was predisposed to commit the crimes charged. Ibid. We also stated that the instructions [did not] narrowly focus the jury's attention on the specific use of the other-crime evidence." Ibid.

We nevertheless held the charge was not reversible error. Id. at 42-44. We noted that even if defendant had requested a limiting instruction, it likely would have been of little value. Id. at 43. That same reasoning applies here.

19

Although the trial judge should have instructed the jury that it could not consider the other-crimes evidence as evidence that defendant had a propensity to commit sexual assaults of the sort alleged here, it is unlikely it would have affected the outcome of the case. The error was not "clearly capable of producing an unjust result." See R. 2:10-2.

## III.

Next, defendant argues that the trial court erred by allowing the State to admit B.W.'s out-of-court statements regarding sexual abuse pursuant to Rule 803(c)(27), which provides:

> A statement by a child under the age of [twelve] relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil proceeding if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement . . . ; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse . . . .
>
> [N.J.R.E. 803(c)(27).]

Defendant contends B.W.'s statements were unreliable and the admission of these statements denied him due process and a fair trial. We disagree.

20

"Courts applying 803(c)(27) . . . have looked to the trustworthiness factors outlined in [Idaho v.] Wright[, 497 U.S. 805 (1990)] when determining if a child victim's out-of-court statements are admissible." State v. D.G., 157 N.J. 112, 126 (1999) (citations omitted). The Wright factors are non-exhaustive, but include "spontaneity, consistency of repetition, lack of motive to fabricate, the mental state of the declarant, use of terminology unexpected of a child of similar age, interrogation, and manipulation by adults." Id. at 125 (citing Wright, 497 U.S. at 821-22). The statement must be inherently trustworthy and therefore corroborating evidence cannot be considered. Ibid. (citing Wright, 497 U.S. at 822-23).

On appeal, we must affirm the trial court's finding that a child's statement meets the trustworthiness requirement under Rule 803(c)(27) unless that determination is an abuse of discretion. P.S., 202 N.J. at 250 (citing State v. Nyhammer, 197 N.J. 383, 411 (2009)). The trial court's determination "should not be disturbed unless, after considering the record and giving the deference owed to the court's credibility findings, it is apparent that the finding is 'clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction[.]'" Id. at 250-51 (alteration in original) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

A-5701-16T1

Here, the motion judge issued a thorough oral opinion finding that B.W.'s statements were trustworthy and admissible under Rule 803(c)(27). The judge noted that B.W. made her statements to her mother spontaneously after B.W. returned from defendant's home after a visit. The judge found that B.W. "freely volunteered the information to her mother[,]" although it occurred after C.G.Y. questioned B.W. The judge also noted that B.W.'s report was consistent and her statements were age-appropriate.

The judge further found that B.W.'s statements to Capraru were made in a relatively spontaneous manner. Capraru asked B.W. whether there were any touchings that she did not like and B.W. replied, "Yes." She described the touchings, and said that defendant "does this." The judge noted that Capraru's questioning led to B.W.'s disclosures, but the judge found that the questions were not unduly suggestive and B.W.'s language was age-appropriate.

The judge recognized that, at times, B.W. would not say what had happened at defendant's home, and she told the investigator to discuss the allegations with C.G.Y. The judge concluded, however, that "these vacillations . . . [were] hardly surprising given the child's age at the time the statements were made, and the disturbing nature of the subject matter." The judge also found

that B.W. "did not appear . . . coached or coerced," and that she responded spontaneously to the questions asked.

We are convinced there is sufficient credible evidence in the record to support the judge's findings of fact and his conclusion that B.W.'s statements to her mother and to the investigator were trustworthy and admissible under Rule 803(c)(27).  Defendant's arguments to the contrary lack sufficient merit to warrant further discussion.  See R. 2:11-3(e)(2).

IV.

Defendant contends the trial judge erred by failing to properly tailor the model jury instruction on statements of a defendant to the facts of this case. Here, the trial judge gave the jury a modified version of the Model Jury Charge on "Statements of Defendant."  See Model Jury Charges (Criminal), "Statements of Defendant" (rev. June 14, 2010).  The judge stated that:

> There is reference to [K.H.] and [K.A.H.]'s testimony to the alleged statements by the defendant relating to a sleepwalking disorder.  In considering whether or not those – that statement is credible, you should take into consideration the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue.  If after consideration of these factors you determine that the statement was not actually made or that the statement is not credible, then you must disregard the statement completely.  If you find the statement was made and that part or all of the statement is credible, you may give

23

what weight you think appropriate to the portion of the statement you find to be truthful and credible.

On appeal, defendant argues that the charge was flawed because it only made reference to defendant's statements to K.H. and K.A.H. about his sleeping disorder. He contends the judge erred by failing to instruct the jury that the same charge applied to defendant's other statements, specifically, his statements to K.H. and K.A.H. that they should not cooperate with law enforcement or the Division, and his statement to L.H.P. that she should not tell anyone about the assault. Defendant argues that the instruction deprived him of his right to due process and a fair trial.

We note that during the charge conference, defendant's attorney told the judge that she thought the judge should include a reference in the charge to "the sleepwalking disorder" so that the jury would "know exactly what the – charge is referring[.]" Defendant did not object to the instructions or ask the court to reference any other statements in the charge.

We therefore review the instruction under the plain error standard. See Bunch, 180 N.J. at 541 (quoting Afanador, 151 N.J. at 54). We conclude the judge's failure to tailor the model jury charge by referring to defendant's other statements was not an error "clearly capable of producing an unjust result." See R. 2:10-2. The jury could reasonably assume that the instruction would apply

24

to all of defendant's statements, not simply defendant's statements to K.H. and K.A.H. regarding his sleepwalking disorder.

Moreover, defense counsel's decision not to seek references in the instruction to defendant's other statements may have been a strategic decision. Defense counsel may have decided it would be better if the judge did not draw the jury's attention to these other statements. We conclude that while the judge should have mentioned all of defendant's statements in his instruction, the failure to do so was not "clearly capable of producing an unjust result." See R. 2:10-2.

## V.

Defendant argues that his sentence is excessive. He contends the judge erred by considering an inapplicable aggravating factor, and giving undue weight to certain other aggravating factors. He also argues that the judge erred by imposing consecutive sentences on two counts.

Our review of the trial court's sentencing decisions is limited. See State v. Fuentes, 217 N.J. 57, 70 (2014). We must affirm the sentence unless: (1) the trial court violated the sentencing guidelines; (2) the court's findings of the aggravating and mitigating factors "were not based upon competent and credible evidence in the record"; or (3) the court's application of the sentencing guidelines to the facts results in a sentence that is "clearly unreasonable so as to

25

shock the judicial conscience." Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Here, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk of re-offense); four, N.J.S.A. 2C:44-1(a)(4) (lesser sentence will depreciate the seriousness of the offense because defendant violated position of public trust or took advantage of a position of trust or confidence); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The court also found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (defendant has led a law-abiding life for a substantial period of time before committing the offenses). The court found "that the aggravating factors substantially outweigh[ed] the mitigating factors[.]"

The judge merged counts two (third-degree aggravated criminal sexual contact of K.H.) and three (second-degree endangering the welfare of K.H.) with count one (first-degree aggravated sexual assault upon K.H.), and merged count nine (third-degree endangering the welfare of L.H.P.) with count eight (second-degree sexual assault of L.H.P). The judge sentenced defendant to a fifteen-year term of incarceration on count one, three years on counts four (third-degree witness tampering) and five (third-degree witness tampering), seven years on counts six (second-degree sexual assault upon B.W.) and seven (second-degree

endangering the welfare of B.W.), and eight years on count eight (second-degree sexual assault upon L.H.P.).

The judge ordered that count eight would run consecutively to count six, count six would run consecutively to count one, count seven would run concurrently to count six, and counts four and five would run concurrently to each other and to count one. Therefore, the judge imposed an aggregate prison term of thirty years, with an eighty-five percent period of parole ineligibility, pursuant to NERA.

On appeal, defendant argues that the judge erred by finding aggravating factor four. He contends he did not have a formal relationship with L.H.P., who is his brother's step-daughter. We disagree. Here, the judge found that all of the victims

> were very vulnerable children. They were exclusively with him. He was entrusted with their care and he violated that trust as a father and also with regard to his step-niece. He violated the trust that his brother or his brother's wife had in allowing the child to be in his vicinity.

The record supports the judge's finding of aggravating factor four, and his application of that factor to the offenses involving L.H.P. as well as the other victims.

A-5701-16T1

Defendant further argues that the judge failed to provide sufficient reasons for finding aggravating factors three and nine. Again, we disagree. Among other things, the judge noted that defendant had been convicted of multiple offenses that involved multiple victims, and that defendant had not taken responsibility for his actions. The judge provided sufficient reasons for finding aggravating factors three and nine.

Defendant also contends the judge erred by giving more than minimal weight to aggravating factor nine. The judge properly determined, however, that there was a need to deter defendant and others from committing sexual assaults of the sort involved in this case. Defendant's argument on this issue lacks sufficient merit to warrant further comment. See R. 2:11-3(e)(2).

In addition, defendant argues that the judge erred by imposing consecutive sentences on counts six and eight, which charged second-degree sexual assault upon B.W. and L.H.P., respectively. He notes that these sentences are consecutive to the fifteen-year term imposed on count one.

Defendant argues that the judge erred in its application of the factors under State v. Yarbough, 100 N.J. 627, 643-44 (1985), and the judge imposed the consecutive sentences primarily because there were three victims. He asserts

that the resulting sentence is generally excessive for a first-time offender.  We

cannot agree.

In <u>Yarbough,</u> the Court stated that the trial court should consider the

following factors in determining whether to impose a consecutive sentence:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c)  the crimes were committed at different times or separate places, rather than being committed so closely in time as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e)  the convictions for which the sentences to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors;

A-5701-16T1

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.

[Ibid. (footnote omitted).]

This sixth factor was subsequently abrogated by the Legislature. See N.J.S.A. 2C:44-5(a).

"[T]he five 'facts relating to the crimes' contained in Yarbough's third guideline should be applied qualitatively, not quantitatively." State v. Carey, 168 N.J. 413, 427 (2001). A sentencing court has the discretion to impose consecutive sentences even where the "factors support concurrent sentences." Id. at 427-28 (citations omitted).

We are convinced that the court did not abuse its discretion by ordering that the sentences on counts six and eight be served consecutively to each other and to the sentence imposed on count one. As noted, counts one, six, and eight involved sexual assaults committed against different victims. The offenses and their objectives were independent of each other. The offenses involved separate acts, and defendant committed the offenses at different times. We conclude the

30

court properly evaluated the Yarbough factors and the decision to impose consecutive sentences on counts six and eight was not a mistaken exercise of discretion.

In addition, defendant contends the judge erred by ordering him to pay $25,000 in restitution to the Victims of Crime Compensation Office (VCCO). He contends the court did not explain why it was ordering restitution in that amount, and the court did not consider whether defendant had the ability to pay that amount in restitution.

As noted, the judge ordered defendant to pay $25,000 in restitution. The amount appears to have been based on a letter from the Office of the Attorney General stating that the VCCO had paid one of the victims for the loss of support, and the amount of the award to date was $25,000. At sentencing, defendant did not object to the amount of the award or contest his ability to pay.

In any event, we are convinced the restitution award should be vacated and the matter should be remanded to the trial court for reconsideration of that award. On remand, the State shall provide the court with factual support for its request for the award of $25,000 in restitution, and the trial court shall conduct a hearing to determine defendant's ability to pay.

Therefore, we affirm defendant's convictions and the sentences imposed, but reverse the order of restitution and remand for reconsideration of the award of restitution and a hearing on defendant's ability to pay.

Affirmed in part, reversed in part, and remanded for further proceedings on restitution. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32

A-5701-16T1